UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN K. TOSCANO, | Case No. 16-cv-06800-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| NANCY ADAM, et al., | |
| Defendants. | Docket No. 57 |

## I.     INTRODUCTION

In this *pro se* prisoner's civil rights action, Benjamin Toscano complains about prison officials' response to his back problems.  The remaining Defendants, Dr. Lenoir and Dr. Adam, now move for summary judgment.  Mr. Toscano opposes the motion.  For the reasons discussed below, Defendants' motion for summary judgment will be granted and judgment entered in their favor.

## II.     BACKGROUND

Mr. Toscano alleges two Eighth Amendment claims in this action: (1) Dr. Lenoir was deliberately indifferent in responding to his requests for treatment, pain medications and medical appliances for his back problems at a medical visit on September 16, 2016; and (2) Dr. Adam was deliberately indifferent in that she repeatedly denied proper medical treatment and appliances for Mr. Toscano's back problems.  Docket No. 19.  In their motion for summary judgment, Defendants argue that the complaint should be dismissed for nonexhaustion of administrative remedies because Mr. Toscano did not complete the exhaustion process before bringing this action and never named Dr. Adam in an administrative appeal.  Defendants also argue that Dr. Lenoir is entitled to judgment as a matter of law on the merits of Mr. Toscano's Eighth Amendment claim.

The following facts are undisputed unless otherwise noted.

A.    The Parties and Relevant Time Period

The relevant time period in this action is from September 2016 through the filing of the second amended complaint on December 29, 2017.

Mr. Toscano was a prisoner housed at the California State Prison in Corcoran until he was transferred to Pelican Bay State Prison on October 18, 2016.  Docket No. 1 at 3-4.  He currently is housed at Pelican Bay.  He is about 44 years old.  *See* Docket No. 57-4 at 9.  Mr. Toscano has had back problems for many years, and reported to Dr. Lenoir that the back pain first started in 1994. *See* Docket No. 57-4 at 28.

Defendant Dr. Lenoir was Mr. Toscano's primary care provider (PCP) for about a year at Corcoran, and ceased being his PCP when Mr. Toscano was transferred out of Corcoran in mid-October 2016.

Defendant Dr. Nancy Adam was Mr. Toscano's PCP at Pelican Bay.

B.    Medical Care By Dr. Lenoir[1]

The California Correctional Health Care Services (CCHCS) has adopted Pain Management Guidelines to standardize the effective assessment, treatment, and management of patients with acute and chronic pain.  The guidelines recognize that it is generally not possible to relieve all pain in patients with chronic pain.  The treatment goal is to maximize function while avoiding the serious side effects of the stronger pain medications and/or procedures.  The treatment of pain is an ongoing process.  *See* Docket No. 57-4 at 2.

The California Department of Corrections and Rehabilitation (CDCR) has a Telemedicine Department.  Telemedicine practice operates under regulations and guidelines developed by the CDCR.  Although the physician may conduct the visit remotely, an on-site nurse accompanies the inmate-patient and assists with the telemedicine appointments.  *See* Docket No. 57-4 at 2.

Dr. Lenoir was Mr. Toscano's primary care physician (PCP) for almost a year at Corcoran

---

[1] Only Dr. Lenoir argues that she is entitled to summary judgment on the merits of Mr. Toscano's Eighth Amendment claim.  Dr. Adam rests her motion for summary judgment solely on the ground that Mr. Toscano failed to exhaust administrative remedies.  Thus, little mention is made of Mr. Toscano's medical care after he left Corcoran and ceased being Dr. Lenoir's patient.

before he was transferred to Pelican Bay in mid-October 2016. She cared for Mr. Toscano via the CDCR's Telemedicine Department, conducting her visits with him from an off-site location. Docket No. 57-4 at 2. Although Mr. Toscano's only claim alleged against Dr. Lenoir pertains to a September 15, 2016, medical appointment, it is necessary to go back a few months from that date to put that medical care in perspective.

On January 12, 2016, Dr. Lenoir saw Mr. Toscano. This was the first visit at which Mr. Toscano complained of back pain to Dr. Lenoir. Docket No. 63 at 1 (denying back pain was discussed at October 2015 appointment with Dr. Lenoir). Mr. Toscano reported that he had disc degenerative disease for the last two years with nerve damage in the L5/S1 area, as shown by an x-ray taken two years earlier. Dr. Lenoir thought that Mr. Toscano's report of his history of back pain did not correlate with the physical exam done that day (which was normal) or the imaging in his medical file. Docket No. 57-4 at 3. Dr. Lenoir requested x-rays of the back.[2] Also at that visit, Mr. Toscano reported that he had had back pain for the past twenty years with no history of injury or trauma, that his back pain fluctuated between 0 and 10 on a ten-scale, and that the non-steroidal anti-inflammatory drugs (NSAIDs) he had been prescribed provided no significant relief from pain. Mr. Toscano said he had radiating pain and needed nerve medication. Dr. Lenoir suggested a trial of Trileptal (also known as oxcarbazepine), which is used to treat nerve pain. Mr. Toscano refused, objecting that he did not want to use an anti-depressant. Dr. Lenoir thought Mr. Toscano was confusing Trileptal with amitriptyline because she saw a note of his earlier refusal of the latter. Dr. Lenoir explained to Mr. Toscano that there is a certain process used to manage chronic pain, and the initial approach consists of trying medications like Trileptal and amitriptyline.[3] Dr. Lenoir renewed Mr. Toscano's existing prescription for Sulindac (an NSAID)

---

[2] The parties disagree as to whether Dr. Lenoir had to submit a request for services for imaging services and the request had to be approved by a committee (as Dr. Lenoir states) or whether Dr. Lenoir could simply request the x-rays or other imaging services without need for further approval (as Mr. Toscano states). *Compare* Docket No. 57-4 at 3 *with* Docket No. 63 at 1. The disagreement is not as to a material fact because neither party suggests that any radiologic testing Dr. Lenoir wanted was denied by a committee or any third party.

[3] Mr. Toscano states in his opposition brief that he is "now aware that they prescribe such medications [i.e., anti-depressants, anti-convulsants, and medications also used for bipolar conditions] for back pain." Docket No. 62 at 4.

as needed for pain.  Docket No. 57-4 at 4, 9-10.  Dr. Lenoir denied Mr. Toscano's request for approval for a waist-chain-cuffing chrono (i.e., medical permission memorandum).  She reviewed with him the various conditions that qualify for waist-chain cuffing and found that he did not have any of those conditions.  Docket No. 57-4 at 4, 10.

X-rays were done of Mr. Toscano's back on January 19, 2016.  *See* Docket No. 57-4 at 12.

On February 1, 2016, Dr. Lenoir reviewed the results of the back x-rays with Mr. Toscano.  She states that the lumbar spine x-ray showed "'no acute fracture or dislocation.  Chronic lower thoracic compression deformities are present.  Mild spinal curve curvature, may be positional.  Mild degenerative changes in the lower thoracic spine,'" and that the thoracic spine x-ray showed "'no acute fracture or dislocation, mild chronic lower thoracic compression deformities.  Mild to moderate lower thoracic degenerative changes.'"  Docket No. 57-4 at 4-5, 12.  To Dr. Lenoir, the x-rays showed that Mr. Toscano had mild to moderate degenerative changes to his back.  *Id.* at 5.  Her treatment plan was for Mr. Toscano to receive physical therapy, do core strengthening exercises, and take a low dose of Trileptal to address his reported nerve pain.  She continued the prescription for Sulindac (an NSAID).  *Id.* at 5, 12.  Although Dr. Lenoir may have planned for Mr. Toscano to take Trileptal, Mr. Toscano did not take it.  Docket No. 63 at 2.  Her notes from the visit indicate that Mr. Toscano wanted to see a neurosurgeon, but Dr. Lenoir planned to try less invasive modalities of treatment before considering invasive treatment and "would not recommend doing invasive treatment at this time, given his results."  Docket No. 57-4 at 12.

Mr. Toscano's medical records state that he refused to go to an appointment on March 19, 2016, for a pain management follow-up.  Docket No. 57-4 at 14-15.  Mr. Toscano disputes that he refused to attend an appointment and states that he was never called for an appointment.  *Id.* at 15; Docket No. 63 at 3.  The dispute is not material because the appointment was rescheduled for later and Mr. Toscano does not assert any claim related to the missed appointment.

On April 15, 2016, Mr. Toscano had a physical therapy evaluation of his lumbar spine at Dr. Lenoir's request.  The physical therapist noted that Mr. Toscano was functional with activities of daily living (ADLs).  Docket No. 57-4 at 16.  The physical therapist also noted the presence of conditions (i.e., lordosis and kyphosis) that are treated with exercise and education on posture.  *Id.*

4

at 16-17. The physical therapist further noted: "Tight hip flexors. Poor self exercise program (leg raises) irritating LS [lumbrosacral] symptoms." *Id.* at 17. The physical therapist gave Mr. Toscano a handout showing exercises for him to perform independently to address his complaints. *Id.* at 17-20.

On or about August 9, 2016, Dr. Lenoir saw Mr. Toscano again. At this appointment, Mr. Toscano stated that he had gone to physical therapy and done the stretches given to him but still had pain that averaged between 5 and 7 on a ten-scale. Docket No. 57-4 at 5. A physical examination of Mr. Toscano's back was normal. Dr. Lenoir requested an MRI to ensure that there was no pathology. Docket No. 57-4 at 5.

On September 7, 2016, Mr. Toscano went to the appointment for an MRI of his lumbar spine. Either an MRI or a CT-scan of his back was done.[4] The radiologist's report states the following findings and impression:

> The gross alignment of the lumbar spine is within normal limits.
> The vertebral bodies are intact without fracture. The bone marrow
> signal intensities are unremarkable.
> The conus medullaris terminates tat the L1 level and is
> unremarkable.
> There is degenerative signal loss in the invertebral disks at L4-5 and
> L5-S1.
> Findings a[t] specific axial levels:
> L1-T2: Unremarkable.
> L2-3: Unremarkable.
> L3-4: Unremarkable.
> L4/5: Right foraminal disc protrusion moderately narrows the
> neural foramen.
> L5-S1: Right asymmetric disc protrusion impinges upon the right
> descending S1 nerve and contributes to a mild central canal stenosis.
>
> IMPRESSION:
> 1. L4-5 and L5-S1 DEGENERATIVE DISC DISEASE WITH
> DISC PROTRUSIONS.

Docket No. 57-4 at 23.

---

[4] Dr. Lenoir declared that she understood that a CT-scan was done because an MRI could not be performed due to the presence of metal in Mr. Toscano's body, but the imaging report identifies the test as an "MRI Lumbar Spine W/O contrast." Docket No. 57-4 at 6, 23. Mr. Toscano states in different places that an MRI was done or an MRI/CT-scan. *See, e.g.,* Docket No. 19 at 4 ("MRI"); Docket No. 63 at 3 ("MRI/CT scan on 9-7-16"). Neither party contends that it makes any difference to the legal analysis whether the tests was an MRI or a CT-scan or both. For present purposes, the Court will use the more inclusive "MRI/CT-scan" term that Mr. Toscano uses.

On September 8, 2016, Mr. Toscano refused care from a nurse and refused to attend a medical appointment in connection with his medical appeal, according to his medical records. Docket No. 57-4 at 6, 24, 25.

On September 15, 2016, Dr. Lenoir reviewed the results of the September 7, 2016 imaging with Mr. Toscano. According to Dr. Lenoir, the "imaging showed degenerative changes, not a new injury to his back." Docket No. 57-4 at 6. Mr. Toscano contends that the imaging did show a new injury.[5] Dr. Lenoir's notes state that she went over the imaging with Mr. Toscano; she also noted that "the moderate narrowing of the neural foramina and at L4-L5 may explain some of his radiculopathy." Docket No. 57 at 29.

At the September 15 appointment, Dr. Lenoir and Mr. Toscano also discussed medications to treat Mr. Toscano's chronic back pain. Mr. Toscano requested a prescription for gabapentin. The prescription of gabapentin is restricted by the Pain Management Guidelines. "Gabapentin cannot be prescribed for the off-label use of treating peripheral neuropathy until and unless the CDCR physician has made an evidentiary showing that (1) an inmate-patient actually had objective evidence of a neuropathy, and (2) the patient had failed other treatment such as a trial of

_____

[5] The parties disagree as to whether the September 7, 2016 MRI/CT-scan showed that Mr. Toscano had a new injury. Mr. Toscano states he had a new injury because the results now showed a problem at the L4-5 disc whereas earlier imaging only showed injury to his L5-S1 disc. Dr. Lenoir does not disagree that the MRI/CT-scan result showed a problem at the L4-5 disc, but states that the MRI/CT-scan result shows "degenerative changes only" rather than a new injury. *Compare* Docket No. 63 at 2, 3 *with* Docket No. 57-4 at 6. Dr. Lenoir's statement that degenerative changes were shown is consistent with the radiologist's impression of "L4-5 and L5-S1 degenerative disc disease with disc protrusions." Docket No. 57-4 at 23. The parties' disagreement appears to stem from different views of the word "injury." There is no evidence that a specific event (like a car accident or fall down a flight of stairs) caused Mr. Toscano's back pain in 2016. In that respect, there is no evidence of a new injury. Insofar as Mr. Toscano uses "injury" to mean symptoms, the parties are in agreement that Mr. Toscano reported low back pain that occasionally radiated down his leg, and neither party states that he had reported radiating pain before seeing Dr. Lenoir in early 2016. The parties do not dispute what the MRI/CT-scan imaging report stated as to the condition of Mr. Toscano's back, i.e., that it showed "foraminal disc protrusion moderately narrows the neural foramen" (as well as that there was "disc protrusion" at L5-S1 and that the radiologist's impression was "L4-5 and L5-S1 degenerative disc disease with disc protrusions." Docket No. 57-4 at 23. Dr. Lenoir presents no evidence that the L4-5 condition was depicted on imaging before the September 7, 2016 MRI/CT-scan, but it does not flow from that fact that it must be considered a new injury instead of further evidence of "degenerative disease" as she states in her declaration. In any event, the disagreement as to whether there was a new "injury" is not as to a material fact because there is no evidence that the treatment would have been different if the situation was deemed to have been be a new injury instead of further degenerative changes to his back.

formulary" medications. Docket No. 57-4 at 6-7. Dr. Lenoir explained to Mr. Toscano that the first line medications that she would use for treatment of his chronic pain were Tegretol (also known as carbamazepine) and Trileptal. *Id.* at 7, 29. At Mr. Toscano's request, Dr. Lenoir arranged for additional information on Tegretol and gabapentin to be provided to him. Dr. Lenoir also continued the prescription for Sulindac as needed for pain. *Id.*[6]

Dr. Lenoir did not have any further appointments with Mr. Toscano after September 15, 2016. At the end of the appointment on September 15, Dr. Lenoir noted that Mr. Toscano should be seen in 90 days for a follow-up on his complaints of back pain. Docket No. 57-4 at 29-30. Mr. Toscano was transferred to Pelican Bay in mid-October 2016.

Dr. Lenoir declares that her care for Mr. Toscano met "the CDCR's standard of care as well as that of the medical community," and that she "use[d] at least the degree of knowledge and skill ordinarily possessed and exercised by members of my profession under similar circumstances." Docket No. 57-4 at 7.

There is no evidence that any doctor recommended surgery, "medical appliances," or gabapentin for Mr. Toscano while he was under Dr. Lenoir's care.

C.     Mr. Toscano's Inmate Appeal

Mr. Toscano filed one inmate appeal that pertained to the medical care for his back problems during the relevant time period.[7] Specifically, he submitted an inmate appeal on September 16, 2016, that was assigned inmate appeal Log No. COR HC-16061135. Docket No. 57-3 at 6. In that inmate appeal, Mr. Toscano complained about Dr. Lenoir's care for him. He wrote that he had seen Dr. Lenoir on September 15, 2016, to discuss the "MRI I had on 9-7-16 for

---

[6] The parties disagree as to whether Mr. Toscano also requested morphine at the September 15, 2016 visit. Mr. Toscano states that he did not do so, Docket No. 63 at 3, and the Court accepts that statement by the nonmoving party as true for purposes of ruling on Defendants' motion for summary judgment. The disagreement is not as to a material fact, however. Mr. Toscano does not contend he should have been provided morphine, and Dr. Lenoir does not suggest that Mr. Toscano asked for morphine for improper purposes.

[7] In his opposition papers, Mr. Toscano attaches a copy of another inmate appeal, Log No. COR HC-14055248. Docket No. 63 at 2, 31. That inmate appeal was submitted in February 2014, more than two years before any of the acts or omissions giving rise to the claims in this action occurred and long before he ever was treated by either Defendant. The inmate appeal submitted in 2014 is irrelevant to the administrative exhaustion issue in this case.

re occurring back injury." Docket No. 57-3 at 6, 8. He described the results of the MRI/CT-scan and then wrote that Dr. "Lenoir denied all my request for the proper and effective treatment: back brace, cane, wheel chair, lower tier/lower bunk chrono, waist chain, effective pain medication, and gabapentin – commonly used and issued to inmates with back injury condition like mines. P. Lenoir wants to use me as a guinea pig to experiment some new medications not treated for my serious back injury. She also deny my request for immediate back surgery to relieve the pressure on my back, spine, nerve etc. in violation of the 8th Amend." *Id.* at 8 (errors in source).

Mr. Toscano was interviewed for the inmate appeal on October 6, 2016. Docket No. 57-3 at 10; *see* Docket No. 19 at 5.

The inmate appeal was "partially granted" at the first level signed on October 28, 2016. Docket No. 57-3 at 10-12; *see* Docket No. 19 at 5. The inmate appeal response stated that Mr. Toscano's requests for a back brace and effective pain medications were duplicative of other appeals and would not be addressed in this appeal; his request for gabapentin was "partially granted" in that Mr. Toscano had been prescribed oxycarbazepine for his back complaints; and his other requests were denied. *Id.* at 10-11.

The inmate appeal was "partially granted" at the second level in a response signed December 22, 2016. *Id.* at 13-14. The response denied all of Mr. Toscano's requests except that the response (a) "partially granted" his request regarding pain medications, noting that his PCP had prescribed Sulindac for back pain and that Mr. Toscano could discuss the matter with his PCP by submitting a health care services request form if Mr. Toscano had further pain or wanted to discuss different medication options; and (b) granted Mr. Toscano's request for products to relieve constipation. *Id.*

The inmate appeal was denied at the third level in a response dated March 29, 2017. Docket No. 57-3 at 3-5.

Dr. Adam did not sign any of the inmate appeal responses.

Mr. Toscano's original complaint in this action is dated November 8, 2016. Docket No. 1 at 4. He wrote on that document that he had received "no response" to his inmate appeal. *Id.* at 1; *see also id.* at 4 ("Plaintiff HC #16061135 has *not* been responded to either by PBSP or

Corcoran"). Mr. Toscano's statements in his complaint that his health care appeal had not been responded to were false: he already knew the inmate appeal number and had written it on the original complaint; he had been interviewed for the appeal on October 6, 2016, by a nurse who allegedly denied all his requests; and the written decision denying the inmate appeal was issued on October 28, 2016. *See* Docket No. 1 at 4; Docket No. 19 at 5. Mr. Toscano's original complaint did not mention his visit with Dr. Lenoir on September 15, 2016; in fact, his complaint conveyed the impression that no one had bothered to see him after the September 7 MRI/CT-scan was done. Docket No. 1 at 4.

Mr. Toscano's amended complaint is dated May 22, 2017. Docket No. 7 at 4. His second amended complaint is dated December 29, 2017. Docket No. 19 at 8.

### III. VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the complaint occurred at a prison in Del Norte County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

### IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of

identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Toscano's second amended complaint is made under penalty of perjury and therefore is considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W.*

*Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id.* at 631.

## V.  DISCUSSION

A.  Exhaustion of Administrative Remedies

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter*, 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90. An inmate "need not exhaust *unavailable* [remedies]." *Ross*, 136 S. Ct. at 1858 (emphasis added). An administrative remedy is unavailable if, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or if it is "so opaque that it becomes, practically speaking, incapable of use"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of

1    appeal and receive a decision from the Secretary of the CDCR or his designee. *Id.* § 3084.1(b), §

2    3084.7(d)(3).

3         1.      <u>Dr. Adam – Failure To Name Defendant In Administrative Appeal</u>

4         Dr. Adam argues that Mr. Toscano did not exhaust administrative remedies for his claim

5    against her because he never named her in his administrative appeal. The Court agrees.

6         The amount of detail in an administrative grievance necessary to properly exhaust a claim

7    is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218

8    (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate

9    notice, the prisoner need only provide the level of detail required by the prison's regulations").

10    California prisoners are required to lodge their administrative complaint on a CDCR 602 form (or

11    a CDCR 602-HC form for a health care matter). The level of specificity required in the appeal is

12    described in a regulation:

13             The inmate or parolee shall *list all staff member(s)* involved and

14             shall describe their involvement in the issue. To assist in the
               identification of staff members, the inmate or parolee *shall include*

15             *the staff member's last name, first initial, title or position, if known,*
               *and the dates of the staff member's involvement* in the issue under

16             appeal. If the inmate or parolee does not have the requested
               identifying information about the staff member(s), he or she shall

17             provide any other available information that would assist the appeals
               coordinator in making a reasonable attempt to identify the staff

18             member(s) in question.

19    Cal. Code Regs. tit. 15, § 3084.2(a)(3) (emphasis added). Another regulation provides that

20    "[a]dministrative remedies shall not be considered exhausted relative to any new issue,

21    information, or person later named by the appellant that was not included" in the originally

22    submitted CDCR-602 inmate appeal form. Cal. Code Regs. tit. 15, § 3084.1(b).

23         Several Ninth Circuit cases have referred to California prisoners' grievance procedures as

24    not specifying the level of detail necessary and instead requiring only that the grievance "describe

25    the problem and the action requested." *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir.

26    2014) (quoting former Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California

27    regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code

28    Regs. tit. 15, § 3084.2(a)"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison's

procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison
to the nature of the wrong for which redress is sought'").  Those cases are distinguishable,
however, because they did not address the regulation as it existed at the time of the events
complained of in Mr. Toscano's second amended complaint.  Section 3084.2 was amended in
2010 (with the 2010 amendments becoming operative on January 28, 2011), and those
amendments included the addition of subsection (a)(3).  *See* Cal. Code Regs. tit. 15, § 3084.2
(history notes 11-12 providing operative date of amendment).  *Wilkerson* and *Sapp* used the pre-
2011 version of section 3084.2, as evidenced by their statements that the regulation required the
inmate to "describe the problem and the action requested" – a phrase that does not exist in the
version of the regulation in effect in and after 2011.  *Griffin* is distinguishable because it discussed
the Maricopa County Jail administrative remedies rather than the CDCR's administrative
remedies.  Whatever the former requirements may have been in the CDCR and whatever
requirements may still exist in other facilities, since January 28, 2011, the operative regulation has
required California prisoners using the CDCR's inmate appeal system to list the name(s) of the
wrongdoer(s) in their administrative appeals.

Defendant Dr. Adam has carried her burden to demonstrate that Mr. Toscano did not
exhaust the available administrative remedies as to his claim against her.  The undisputed evidence
shows that California provides an administrative remedies system for California prisoners to
complain about their conditions of confinement, and that Mr. Toscano used that California inmate
appeal system to complain about some events that gave rise to his second amended complaint.
The regulation requires that the prisoner provide the name of the wrongdoing official and describe
the official's involvement in the issue.  Cal. Code Regs. tit. 15, § 3084.2(a)(3).  The undisputed
evidence shows that the only inmate appeal Mr. Toscano filed pertaining to events alleged in the
amended complaint that received a decision at the third level did not mention Dr. Adam and did
not assert any wrongdoing by Dr. Adam.  Dr. Adam met her initial burden to prove "that there was
an available remedy, and that [the plaintiff] did not exhaust that available remedy."  *Albino*, 747
F.3d at 1172.

Once Dr. Adam met her initial burden, the burden shifted to Mr. Toscano to come forward

13

with evidence showing that something in his particular case made the existing administrative remedies "effectively unavailable to him." *Id.* Mr. Toscano fails to make the requisite showing.

Mr. Toscano offers up several reasons why his failure to file a grievance naming Dr. Adam as a wrongdoer should be excused, but none are persuasive. First, he urges that he "did not have to name any defendant in his appeal because they were documented in his reports." Docket No. 62 at 5. He is wrong on the law: the regulation explicitly requires the prisoner to "list all staff member(s) involved and . . . describe their involvement in the issue," and to provide the "staff member's last name, first initial, title or position, if known." Cal. Code Regs. tit. 15, § 3084.2(a)(3). Mr. Toscano's failure to name Dr. Adam is not surprising, given that he first filed his inmate appeal (Log No. COR HC-16061135) before he was transferred to Pelican Bay, where Dr. Adam worked. That he began his inmate appeal before he even met Dr. Adam does not excuse Mr. Toscano's failure to name her; to the contrary, it buttresses the conclusion that her conduct was not the subject of his inmate appeal.

Second, Mr. Toscano argues that other courts have rejected the argument that a failure to name a defendant amounts to a failure to exhaust, citing to a case he simply refers to as "*Estrada*" from the Eastern District of California. Docket No. 62 at 5, 6. As explained above, the Ninth Circuit cases (*Sapp* and *Wilkerson*) – which are binding precedent, unlike the inadequately identified district court case cited by Mr. Toscano -- indicating that CDCR prisoners' grievance procedures do not specify the level of detail necessary are based on a regulation that has since been amended. Under the regulation in place at the relevant time, Mr. Toscano was required to name the involved official and describe her conduct but he did neither for Dr. Adam. *See* Cal. Code Regs. § 3084.2(a)(3).

Third, Mr. Toscano argues that, "if Defendants had a problem with naming said defendants they should [have] said something during the appeal process." Docket No. 62 at 6. But Defendants were not the decisionmakers on the inmate appeal and would have had no occasion to notice a problem. Moreover, the actual decisionmakers would have had no reason to believe that the appeal that complained about Dr. Lenoir's care for Mr. Toscano at Corcoran State Prison also meant to complain about care by a different doctor at a different prison. The fact that the prison

14

United States District Court
Northern District of California

officials resolved the appeal that Mr. Toscano had specifically identified as being about Dr.

Lenoir's care does not suggest that prison officials "ignore[d] the procedural problem" of Mr.

Toscano not identifying other prison officials who may have done something he found

objectionable; prison officials had no reason to suspect from the inmate appeal filed that there was

a procedural problem of unidentified other wrongdoers who had not even taken action at the time

Mr. Toscano filed his inmate appeal. Prison officials did not choose to ignore a problem of which

they were not made aware. *Cf Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016) (exhaustion

occurred where "prison officials ignore[d] the procedural problem and render[ed] a decision on the

merits of the grievance").[8]

Finally, Mr. Toscano argues that "[t]here is *no* federal requirement in federal pleading that

plaintiff must know and identify the name of every individual who has participated in an alleged

wrong for either the administrative claims filings or the pleading of a § 1983 civil rights action."

Docket No. 62 at 5. His argument misses the mark because the question at the summary judgment

state is whether he did exhaust and not whether he needed to plead that he exhausted.

Mr. Toscano failed to properly exhaust his administrative remedies as to Dr. Adam

because he did not name her in his inmate appeal or specifically describe her alleged wrongdoing

as required by CDCR's regulations. *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands

compliance with an agency's deadlines and other critical procedural rules because no adjudicative

system can function effectively without imposing some orderly structure on the course of its

proceedings."); *see, e.g. Parks v. Chappell*, 2015 WL 3466280 (N.D. Cal. 2015) (Chen, J.)

---

[8] In *Reyes*, the California prisoner whose health care appeal concerning inadequate pain management failed to identify two prison doctors, as required by CDCR's regulation, nevertheless exhausted his claim of deliberate indifference to serious medical needs against the two prison doctor defendants because the appeal was decided on its merits at all levels of review. *See id.* at 656-57. But this does not mean that a claim decided on the merits necessarily exhausts as to all possible defendants. There must be a sufficient connection between the claim in the appeal and the unidentified defendant(s) to provide prison officials with "notice of the alleged deprivation" and an "opportunity to resolve it." *Id.* at 659. In *Reyes*, the two unidentified prison doctors had a sufficient connection with plaintiff's claim in the appeal concerning inadequate pain management because prison officials plainly knew that the two unidentified prison doctors served on the pain management committee that had determined that plaintiff should not receive narcotic pain medication. *See id.* By contrast, Mr. Toscano's inmate appeal complaining about Dr. Lenoir's care would not have alerted prison officials to his problems with another doctor at a different prison.

(granting summary judgment in warden's favor because inmate appeal about injury-causing event did not mention warden by name or title); *Martinez v. Swift*, 2015 WL 1349525, at *2 (N.D. Cal. 2015) (Seeborg, J.) (granting summary judgment for nonexhaustion because the grievance "does not mention [defendant], or describe with any specificity his actions or words" and therefore did not comply with section 3084.2(a)(3)); *Panah v. State of Cal. Dep't of Corr. and Rehab.*, 2015 WL 1263494, at *9-10 (N.D. Cal. 2015) (Freeman, J.) (even if plaintiff's failure to pursue inmate appeal to highest level is excused, he failed to properly exhaust his claim against the warden because his inmate appeal did not name the warden or describe the basis for his liability); *Gray v. Smith*, 2015 WL 875482, at *2-3 (N.D. Cal. 2015) (Alsup, J.) (granting summary judgment for nonexhaustion where inmate appeal described an incident at the prison but did not name the warden and did not describe a widespread practice or that the warden knew of the incident and failed to stop it).

Bearing in mind that Dr. Adam has the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Mr. Toscano, the court concludes that Dr. Adam is entitled to judgment as a matter of law on the affirmative defense that Mr. Toscano failed to exhaust administrative remedies for his § 1983 claim against her.

2.     <u>Dr. Lenoir – Failure To Exhaust Before Bringing Suit</u>

Dr. Lenoir and Dr. Adam argue that Mr. Toscano did not exhaust his administrative remedies for the separate reason that he failed to complete the administrative appeal process *before* he filed this action. The Court disagrees.

The administrative exhaustion statute requires that the administrative remedies be exhausted before the action is brought. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until such administrative remedies as are available are exhausted."). In *McKinney v. Carey*, 311 F.3d 1198, 1200-01 (9th Cir. 2002), the court determined that an action had to be dismissed when the plaintiff did not exhaust his administrative remedies before filing suit but was in the process of doing so when a motion to dismiss was filed. Later cases from the Ninth Circuit have refined this rule to address the situation where a plaintiff files an amended complaint. When a prisoner files an amended pleading with new claims, the new claims in the amended complaint are treated as

16

"'brought' within the meaning of § 1997e" when the prisoner tenders the amended complaint for filing. *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010). Thus, a prisoner may file an amended complaint and add new claims where the additional cause of action arose after the initial filing, as long as he has exhausted administrative remedies as to those additional claims before filing the amended complaint. *See id.*; *Akhtar v. Mesa*, 698 F.3d 1202 (9th Cir. 2012). Later, the Ninth Circuit gave an even more prisoner-friendly reading of the statute, holding that "claims that arose as a cause of action prior to the filing of the initial complaint may be added to a complaint via an amendment, as long as they are administratively exhausted prior to the amendment." *Cano v. Taylor*, 739 F.3d 1214, 1220 (9th Cir. 2014); *but see id.* at 1221-22 (Silverman, J., dissenting in part) (arguing that majority's rule was contrary to earlier cases and undermined the purpose behind the exhaustion statute because it allowed prisoner to file first and exhaust later).

Here, the original complaint did not mention Dr. Lenoir or the September 15, 2016, medical appointment with Dr. Lenoir. Instead, the complaint named institutional defendants (CDCR and two prisons) and was more of a generalized complaint about the perceived inadequacies of Mr. Toscano's medical care. Docket No. 1. The complaint was dismissed with leave to amend to correct several deficiencies, including that Mr. Toscano had not named individual wrongdoers and had not specified what those persons had done or failed to do. See Docket No. 6. Mr. Toscano did not name Dr. Lenoir and Dr. Adam as Defendants until he submitted his amended complaint on May 22, 2017. *See* Docket No. 7. By that time, he had received a third-level decision on his inmate appeal Log No. COR HC-16061135, which was denied at the third level on March 29, 2017.

Under the reasoning of *Cano*, Mr. Toscano complied with the exhaustion requirement as to Dr. Lenoir. That is, by the time he first presented a pleading (i.e., his amended complaint) alleging a claim against Dr. Lenoir, Mr. Toscano had completed the administrative appeals process because he had received a third-level decision on his inmate appeal Log No. COR HC-16061135. As explained in the preceding section, that inmate appeal did not exhaust any claim as to Dr. Adam, so it cannot be said that Mr. Toscano had completed the administrative appeals process as to her by virtue of having received a third-level decision on inmate appeal Log No. COR HC-

16061135 about Dr. Lenoir's care.

Dr. Lenoir is not entitled to summary judgment in her favor on the affirmative defense of nonexhaustion, but Dr. Adam is. The claim against Dr. Adam will be dismissed without prejudice to Mr. Toscano filing a new action against her after he properly exhausts his administrative remedies for the claim.

B.  Eighth Amendment Claim

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

1.  Objective Prong

To satisfy the objective prong, there must be a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted).

There is evidence in the record that Mr. Toscano had back pain for several years. On this record, a reasonable jury could conclude that his back problems amounted to a serious medical need for the Eighth Amendment's objective prong.

2.  Subjective Prong

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but she "must also draw the inference." *Id.* Deliberate indifference may be

1    demonstrated when prison officials deny, delay or intentionally interfere with medical treatment,

2    or it may be inferred from the way in which prison officials provide medical care.  *See McGuckin*

3    *v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (although surgery was not done until three months

4    after prisoner's need for back surgery was unambiguously diagnosed and over three years after the

5    injury, defendants were entitled to summary judgment because plaintiff did not raise a triable issue

6    that these defendants were responsible for the delay), *overruled on other grounds by WMX Techs.,*

7    *Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*).  There must be "harm caused by the

8    indifference," although the harm does not need to be substantial.  *See Jett*, 439 F.3d at 1096.

9        Negligence does not amount to deliberate indifference and does not satisfy the subjective

10   prong of an Eighth Amendment claim.  S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir.

11   2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-

12   doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

13       A difference of opinion as to which medically acceptable course of treatment should be

14   followed does not establish deliberate indifference.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.

15   1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a

16   doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of

17   opinion as to proper course of care where prison medical staff treated his recurring abscesses with

18   medicines and hot packs).  "[T]o prevail on a claim involving choices between alternative courses

19   of treatment, a prisoner must show that the chosen course of treatment 'was medically

20   unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive

21   risk to [the prisoner's] health.'"  *Toguchi*, 391 F.3d at 1058 (second alteration in original).

22       Prison officials cannot avoid Eighth Amendment liability by simply declaring that they

23   disagree with a specialist's or treating doctor's prescribed course of care.  The limits of the

24   difference-of-opinion rule were illustrated in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012),

25   *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), where the Ninth

26   Circuit determined that the district court erred in granting summary judgment for defendants who

27   argued that their refusal to approve double hip-replacement surgery for a prisoner who could

28   barely walk due to hip pain showed a mere difference of opinion.  In *Snow*, the prison medical

committee repeatedly refused to authorize a double hip-replacement surgery, even though an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. *See id.* at 986. Not only had the medical committee refused to authorize the surgery, the committee "gave no medical reason for the denials" and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff. *Id.* at 986-87. *Snow* rejected the defendants' argument that their choice to treat the prisoner with medications rather than surgery showed merely a difference of opinion that did not amount to an Eighth Amendment violation. *Id.* at 987-88. Although there was "clearly a difference of medical opinion," the evidence in the record and inferences therefrom could allow a reasonable jury to "conclude that the decision of the nontreating, nonspecialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id.* at 988. Significantly, the defendants sent the prisoner for evaluation by orthopedic surgeons, both of whom recommended double hip-replacement surgery. *Id.* One of those surgeons testified at his deposition that the prisoner's likelihood of success after the surgery was very high, that surgery would help improve the prisoner's health and mobility, and that the surgery would allow the prisoner to avoid the use of the medications that were causing other health problems for the prisoner. On this record, "it should be for the jury to decide whether any option other than surgery was medically acceptable." *Id.* The court acknowledged that "a medication-only course of treatment may have been medically acceptable for a certain period of time," but saw the multi-year delay in approving the recommended surgery as presenting a triable issue as to medical acceptability of defendants' course of treatment under the circumstances. *Id.*

Snow did not hold that a triable issue is shown whenever prison officials fail to follow a doctor's recommended course of care. Indeed, *Snow*'s discussion shows that it was the unthinking denial-without-medical-reason behavior of prison officials that could allow a jury to conclude that the prison officials had acted with deliberate indifference to that inmate's medical need. The Ninth Circuit distinguished Snow's situation from that in *Toguchi*, where the plaintiff challenged the defendant-doctor's choice to discontinue a particular medication but did not present expert testimony showing that the discontinuation of the medication was medically unacceptable, and the

defendant-doctor had submitted expert testimony that her actions met the standard of care. *See Snow*, 681 F.3d at 988-89 (citing *Toguchi*, 391 F.3d at 1055-56). The Ninth Circuit also distinguished *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), on the basis that "only one prison doctor told the inmate that surgery would be necessary" in *Sanchez*, whereas "the consistent recommendation by two outside specialists over the course of three years" in *Snow* was that the prisoner needed double hip-replacement surgery to alleviate his severe pain and mobility issues. *Snow*, 681 F.3d at 989. *Accord Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (finding that case did not involve simply a difference of opinion because evidence showed defendants ignored the recommendations of treating specialists that plaintiff needed cataract surgery and relied instead on nonspecialist/nontreating medical officials to make decisions based on an administrative policy that cataract surgery would not be provided when other eye was functional).

In the present case, there is at best a difference of opinion between patient and doctor as to the proper course of care. Mr. Toscano disagrees with the course of care pursued by Dr. Lenoir, but completely fails to present any evidence that the course of care pursued by Dr. Lenoir was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Mr. Toscano's health. *See Toguchi*, 391 F.3d at 1058.

There is no evidence on which a reasonable jury could rely to conclude that Dr. Lenoir was deliberately indifferent to Mr. Toscano's back problems. It is undisputed that, from January 12, 2016, when Mr. Toscano first complained of back pain to Dr. Lenoir) until September 15, 2016 (their last appointment), Dr. Lenoir obtained specialty services for Mr. Toscano, namely lumbar x-rays, physical therapy, and an MRI/CT-scan. And it is undisputed that the physical therapist provided instructions on exercises Mr. Toscano could do for his back and that Dr. Lenoir recommended stretches for him to do for core strengthening. It also is undisputed that Dr. Lenoir addressed Mr. Toscano's complaints of pain: Dr. Lenoir repeatedly renewed Mr. Toscano's prescription for Sulindac (an NSAID) so that he would have some pain relief and offered Mr. Toscano a trial of different medications, which he refused. The evidence also is undisputed that Dr. Lenoir denied Mr. Toscano's request for gabapentin because he did not qualify for that medication under the CDCR Pain Management Guidelines.

Mr. Toscano also fails to show a triable issue in support of his allegation that Dr. Lenoir should have provided him "appliances" and a chrono for waist-chain cuffing. He submits a copy of a portion of a policy manual regarding comprehensive accommodation chronos with "x" marks next to the criteria that he contends support his entitlement to various appliances. *See* Docket No. 63 at 14-16; *see also* Docket No. 62 at 3. Although he marked that he had various conditions, those conditions had not been diagnosed for him. For example, the policy manual states that canes, walkers, and wheelchairs can be provided for people with "severe chronic pain condition," "severe lower extremity edema," and "acute injury"; he marked himself as having each of those conditions but none of them had been determined to exist by any health care provider. Docket No. 63 at 15. Mr. Toscano's self-diagnosis fails to raise a triable issue that failing to provide him appliances for his back pain amounted to deliberate indifference. Dr. Lenoir denied Mr. Toscano's request for a chrono authorizing waist-chain cuffing, but there is no competent evidence that he qualified for waist-chain cuffing or that the failure to authorize waist-chain cuffing amounted to deliberate indifference to a serious medical need. Although Mr. Toscano might have been more comfortable in waist-chain handcuffs instead of traditional behind-the-back handcuffs, he fails to provide evidence that would allow a reasonable trier of fact to find that the denial of a waist-chain cuffing chrono was "medically unacceptable under all of the circumstances" and done "in conscious disregard of an excessive risk" to Mr. Toscano's health. *Toguchi*, 391 F.3d at 1058.

Mr. Toscano's failure of proof is particularly glaring with regard to his demand for back surgery. The evidence shows that Dr. Lenoir rejected Mr. Toscano's request to see a neurosurgeon at a visit on February 1, 2016, because she wanted to try less invasive modalities of treatment before considering invasive treatment and "would not recommend doing invasive treatment at this time, given his results." Docket No. 57-4 at 12. Mr. Toscano presents no evidence that surgery was medically appropriate in February 2016 or at any time during which Dr. Lenoir was his PCP. No health professional made such a recommendation. Mr. Toscano's "evidence" amounts to his own lay opinion that "non-invasive back surgery" should have been done because it "is commonly performed on back injuries like plaintiff's. And is highly televised on commercials like the Laser Spine Institute." Docket No. 63 at 4. The sales pitch in a television

22

commercial plainly does not establish the standard of care in the medical community. Mr. Toscano provides no competent evidence that back surgery would have worked; in fact, he does not even specify what kind of back surgery he supposedly needed or was appropriate before less invasive measures were utilized to attempt to address his back pain. Unlike the situation in *Snow*, and like the situation in *Toguchi*, Dr. Lenoir has presented medical reasons for her choice to deny the surgery that Mr. Toscano contends should have been provided. Dr. Lenoir determined that surgery was inappropriate given Mr. Toscano's normal physical exam and x-rays, which showed mild to moderate degenerative changes in his back, and given the fact that less invasive methods of treatment had not yet been tried. And, as in *Toguchi*, Mr. Toscano does not present expert evidence to show that Dr. Lenoir's course of care was medically unacceptable.

Mr. Toscano urges that the x-rays and MRI/CT-scan showed that he needed appliances, gabapentin, and back surgery. This is the sort of speculation without any competent supporting medical evidence that plagues Mr. Toscano's case. There is no evidence that Mr. Toscano has any medical training or is otherwise competent to opine as to the appropriate care of back problems.

Mr. Toscano attempts to re-introduce dismissed defendants and introduce new claims in his opposition papers, but he may not do so. The Court earlier dismissed several defendants and denied Mr. Toscano's motion to reinstate those defendants. *See* Docket No. 24 at 4-5; Docket No. 28. Mr. Toscano's arguments regarding those defendants are misguided because they have been dismissed from this action. Mr. Toscano also attempts to introduce a retaliation claim by making unsupported conclusory assertions that he received deficient medical care in retaliation for exercising his First Amendment right to file medical complaints for treatment. *See* Docket No. 63 at 1. He did not allege a retaliation claim in his complaint, amended complaint or second amended complaint and it is too late to do so now that Defendants have filed their motion for summary judgment. *Cf. Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (district court properly refused to allow plaintiffs to proceed with new theory of liability first raised at summary judgment stage because it would prejudice defendant: "complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations").

United States District Court
Northern District of California

Moreover, the timing cannot give rise to a retaliation claim against Dr. Lenoir because Mr. Toscano indisputably did not file his inmate appeal complaining about her medical care until *after* he ceased being her patient. First Amendment activity that follows allegedly retaliatory conduct is not the *cause* of that allegedly retaliatory conduct. *Cf. Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) ("Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.") (footnote omitted). Insofar as Mr. Toscano means that Dr. Lenoir's refusal to accede to his demands at the medical appointments means she was retaliating for those demands, Mr. Toscano misunderstands the essence of a retaliation claim. Merely making a decision adverse to a prisoner is not inherently retaliatory.

A physician is not required to be a guarantor of a patient's good health, regardless of whether the patient is in prison or at liberty. What the prison physician cannot do is be deliberately indifferent to an inmate's serious medical needs. Mr. Toscano fails to present evidence that would allow a reasonable jury to find that Dr. Lenoir was deliberately indifferent to his back-care needs. Unlike the situation in *Snow*, and like the situation in *Toguchi*, Dr. Lenoir presents evidence that the chosen course of care was medically acceptable. And, as in *Toguchi*, Mr. Toscano does not present expert evidence to show that Dr. Lenoir's decisions were medically unacceptable and made in conscious disregard of an excessive risk to his health. Even when the evidence is viewed in the light most favorable to Mr. Toscano, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Dr. Lenoir on the Eighth Amendment claim. Dr. Lenoir therefore is entitled to judgment as a matter of law on the Eighth Amendment claim.

///
///
///
///

24

# VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.** Docket No. 57.  Dr. Lenoir is entitled to judgment as a matter of law in her favor on the merits of Mr. Toscano's Eighth Amendment claim.  Defendant Dr. Adam is entitled to judgment as a matter of law in her favor on the affirmative defense of nonexhaustion of administrative remedies.  As to Dr. Adam only, the complaint will be dismissed without prejudice.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: May 29, 2019

_____
EDWARD M. CHEN
United States District Judge